RENDERED: JULY 12, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0367-WC

GENERAL MOTORS, LLC                                APPELLANT

v.                      PETITION FOR REVIEW OF A DECISION
OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-22-01035

GIOVANNI SMITH; HONORABLE W.
GREG HARVEY, ADMINISTRATIVE
LAW JUDGE; AND WORKERS'
COMPENSATION BOARD OF
KENTUCKY                                    APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, GOODWINE, AND KAREM, JUDGES.

KAREM, JUDGE: General Motors, LLC (GM) petitions for review of a Workers'
Compensation Board's (Board's) decision affirming an administration law judge's
(ALJ's) award to Giovanni Smith (Smith) wherein the ALJ awarded temporary
total disability (TTD) benefits, permanent partial disability (PPD) benefits

enhanced by the three-multiplier, and medical expenses.  After careful review, we affirm.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Smith, approximately 54 years of age at the time of his injury, worked in GM's Corvette Plant in Bowling Green, Kentucky.  He was employed by GM for 13 years, first in New York working as a dye setter.  He was transferred to Bowling Green in 2019.  In February 2021, Smith began having pain in his right hand and wrist which he first reported to GM in March 2021.  Smith was ultimately pulled off the line on August 10, 2021, due to his injury and moved to a different position until March 29, 2022, when Smith first missed work due to his injury.  He underwent carpal tunnel surgery on July 13, 2022.

During his deposition, Smith testified as to the nature of the jobs he performed between August of 2021 and March 29, 2022:

> Q: Okay.  Take me through the jobs that you had from the [sic] August 2021 through March 29, 2022.
>
> A: Well, there's a lot of little aspects that happened in-between there between us being laid off because lack of parts from our customers that couldn't come in, so they would lay us off.  Other than that, also because of lack of work, they couldn't find any work for a one-handed person, so they would lay me off because of that.  And the only time that I was actually off because of anything is because I had surgery on the hand.  But other than that, it was either lack of work because of my injury or there was no parts to work with.

Smith's treatment history as outlined by the ALJ is not in dispute:

> Smith began treating with Dr. Keith Morrison at Western Kentucky Orthopedics and Neurosurgery Associates in September 2021. He presented with complaints of right-hand pain, stiffness and swelling particularly in the thumb, index and long finger. Dr. Morrison prescribed Mobic to reduce the inflammation and order x-rays and an MRI. When the MRI did not reveal an issue, Dr. Morrison referred Smith for EMG/NCV of the right hand. That test revealed carpal tunnel syndrome. Dr. Morrison prescribed a brace and administered steroid injections until June 2022. Smith's hand did not improve and a second EMG/NCV was done which confirmed the presence of carpal tunnel syndrome. At that time, Smith was scheduled for a right carpal tunnel release.

> Dr. Morrison performed the right carpal tunnel release on July 13, 2022. Smith did well post-operatively and was released to return to left hand work only on July 28, 2022. Smith was then released to full duty, without restrictions, on September 12, 2022.

On September 12, 2022, Smith did not return to his previous job at the Corvette Plant. He testified his new position was "not as much as before" and he did not believe he could return to his previous position due to experiencing pain down his forearm into the back of his hand. In addition to experiencing trouble clenching his hand and dropping washers and bolts on the job, Smith testified the injury affected his daily life as well:

> Q: Sure. Is there anything that this injury stopped you from being able to [ad]just in your daily life?

-3-

A: Well, yes, actually it does. It stopped me from actually kind of working on my bike a little bit, working on my vehicles. I'm usually a hands-on person. I've been that way for years, a lot of times, I can't do that stuff anymore. And plus, you know, it just -- it -- it does put me down a little bit, to tell you the truth. Because I -- I like doing things like that. It keeps me going. And I can't play with my son as much, you know, pick him up, and -- I can, but I mean, usually I'm -- my right hand's the dominant hand. Sometimes, you know, you'd use -- usually do that, and then when it happens it's like, "Wow, I could feel that pain again. I can't do that." So I've got to do something different.

On January 10, 2023, Dr. Gary Bloemer (Dr. Bloemer) evaluated Smith at his request. As noted by the ALJ, following a review of Smith's medical history and treatment records, Dr. Bloemer made a diagnosis and gave an opinion regarding Smith's impairment.

[Dr. Bloemer] diagnosed arthritis in the right wrist, thumb, index and long finger, chronic cervical radiculopathy at C6 through C8, and right carpal tunnel syndrome, post carpal tunnel release. Dr. Bloemer assessed impairment based on range of motion testing in the right wrist, thumb, index and long finger. Each finger had loss of range of motion. Impairment was awarded for carpal tunnel syndrome and loss of grip strength. Dr. Bloemer opined Smith has 13% whole person impairment based on the 5th Edition AMA Guides.[1] Dr. Bloemer placed Smith at MMI[2] as of October 13, 2022, three months after his carpal tunnel release surgery. He noted Smith had a positive surgical result and could return to work, however, did not feel he could return to

---

[1] American Medical Association's Guides to the Evaluation of Permanent Impairment, 5th ed.

[2] Maximum Medical Improvement.

-4-

his previous position. Dr. Bloemer assessed permanent restrictions of no lifting greater than 40 pounds with the right hand and no repetitive use of the right hand. He also noted Smith would require further treatment for his arthritic condition including evaluations, medications, and injections. Dr. Bloemer believed Smith's right-hand usage would continue to deteriorate and opined the condition of Smith's right hand was caused by repetitive use of the right hand while working for [GM].

He opined Smith is incapable of performing the job he was performing at the time of injury, but he may continue with his current job using a machine and screw gun. He assessed restrictions of no lifting over 40 pounds and no repetitive gripping.

Dr. Michael Nicoson (Dr. Nicoson) evaluated Smith at GM's request relying on the same medical and treatment history upon which Dr. Bloemer relied to make his assessment. He also reviewed Dr. Bloemer's report. Dr. Nicoson's assessment diverged significantly from that of Dr. Bloemer, assessing a 4% whole-person impairment as compared to Dr. Bloemer's assessment of 13%. The doctors had similar assessments of Smith's upper extremity impairment based on hand range of motion loss; Dr. Bloemer – 9% and Dr. Nicoson – 7%.

Dr. Nicoson, like Dr. Bloemer, diagnosed carpal tunnel syndrome resulting from repetitive work activities. However, Dr. Nicoson found the arthritis was not the result of work-related cumulative trauma. He opined Smith had reached MMI for carpal tunnel syndrome and did not require future treatment; however, he felt Smith would require future treatment for the arthritic condition.

He assessed permanent restrictions of medium-duty capacity of work with maximum weightlifting of approximately 50 pounds. Both doctors agree, Smith reached MMI on October 13, 2022.

Smith filed an application for resolution of his claim (Form 101) on September 7, 2022, alleging injury to his right upper extremity caused by cumulative trauma. Smith testified by deposition on November 22, 2022, and at the final hearing held on July 18, 2023. Based on the doctors' evaluations and other evidence presented, the ALJ awarded TTD benefits, PPD benefits enhanced by the three-multiplier, and medical expenses. GM appealed the decision to the Board who affirmed the ALJ. This petition for review followed.

## STANDARD OF REVIEW

"On appeal, our standard of review of a decision of the Workers' Compensation Board 'is to correct the Board only where the . . . Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice.'" *Pike County Bd. of Educ. v. Mills*, 260 S.W.3d 366, 368 (Ky. App. 2008) (citation omitted). "The burden of persuasion is on [Smith] to prove every element of a workers' compensation claim." *Id*. (citation omitted). The ALJ is the sole factfinder in all workers' compensation claims. KRS[3] 342.285(1). In fact,

---

[3] Kentucky Revised Statute.

-6-

"KRS 342.285 designates the ALJ as finder of fact, and has been construed to mean that the factfinder has the sole discretion to determine the quality, character, weight, credibility, and substance of the evidence, and to draw reasonable inferences from the evidence." *Bowerman v. Black Equipment Co*., 297 S.W.3d 858, 866 (Ky. App. 2009). "In short, appellate courts may not second-guess or disturb discretionary decisions of an ALJ unless those decisions amount to an abuse of discretion." *Id*. (citation omitted). An ALJ abuses discretion when the decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id*. at 867. "Furthermore, if the issue presented is one of statutory interpretation, our review is de novo." *Consol of Kentucky, Inc. v. Goodgame*, 479 S.W.3d 78, 81 (Ky. 2015) (citations omitted). With these standards in mind, we review the issues raised in this appeal.

## ANALYSIS

### 1. Smith's eligibility date for TTD

#### a. KRS 342.0011(11)(a)

A determination of when, or if, to award TTD benefits is necessarily a two-part process beginning with a review of the facts in light of the definition of TTD. TTD is defined by statute as "the condition of an employee who has not reached maximum medical improvement from an injury and has not reached a level of improvement that would permit a return to employment[.]" KRS

342.0011(11)(a). It is undisputed that Smith did not reach maximum medical improvement until October 13, 2022, thus ending TTD.

Smith first reported his hand injury in March 2021 resulting in him ultimately being pulled from the line on August 11, 2021, supporting the ALJ's finding of a TTD date of August 1, 2021. However, GM maintains that Smith's true TTD date is March 29, 2022. Although GM does not state it directly, GM's presumptive argument is that the work performed by Smith between August of 2021 and March 29, 2022, was similar enough to his previous job that an award of TTD benefits was not appropriate before March 29, 2022. In support of their argument, GM relies on the holdings in the Supreme Court's decision, *Davis v. Blendex Company*, 626 S.W.3d 523 (Ky. 2021). However, *Davis* and the case at bar are easily distinguishable.

In *Davis*, the employee was inadvertently injured when one of his co-workers sprayed him with a heated pressure washer resulting in a severe burn to his right foot. *Id.* at 524. Davis missed a total of five workdays, returned to work part-time for two months, and was then released to return to his full hours and job duties. During that two-month time period, he performed desk work which would have been done by someone else had he not performed those responsibilities. And, instead of taking a reduction in pay, Davis chose to supplement his income using accrued paid time off hours and vacation pay. *Id.* at 525. However, Davis argued

-8-

he was entitled to TTD benefits for those two months of part-time limited duty work "because it did not constitute a 'return to employment' under KRS 342.0011(11)(a) . . . ." *Id.* at 528. However, the Supreme Court disagreed differentiating Davis's argument from previous cases wherein the Court addressed the term "return to employment":

> [Davis] argues that the fact that he was a full-time employee released to only part-time work entitled him to TTD benefits. He contends that, "the term 'customary [employment]' refers not only to the *type* of work performed, but also the *amount or duration* of that work." To date, no cases in our jurisprudence have addressed the application of *Tipton* to a decrease in the number of hours an injured employee is medically released to work. . . .
>
> . . . Mr. Davis does not assert that his job duties were not within his physical restrictions or that he did not have the experience, training, and education to perform those duties. He simply asserts that the fact that his work hours went from full-time pre-injury to part-time post-injury, alone, is sufficient to find that he did not return to his customary employment. We disagree.

*Id.* at 530-31.

Clearly, *Davis* is inapplicable to the case *sub judice* as there are no issues regarding part-time versus full-time employment. Moreover, if GM is indeed arguing that the work performed by Smith, during the time-period in question, was similar enough to his previous job responsibilities to delay the award of TTD benefits until March 29, 2022, their argument still fails.

Smith was removed from his regular job duties beginning August 2021 through March 2022 before he was placed completely off work. During this time, when GM could find work for him, he performed jobs such as cleaning, dusting, and sweeping. In other words, GM found only "make-work" projects for Smith. At other times, however, there was *no* work he was able to perform due to his injury and he was therefore laid off. Conversely, in *Davis*, the claimant preformed necessary job duties and supplemented his income with previously earned overtime hours and vacation pay.

In *Central Kentucky Steel v. Wise*, 19 S.W.3d 657 (Ky. 2000), the Supreme Court discussed what *type* of work equates to an employee's previous job responsibilities in relation to payments of TTD benefits. The Court opined that while it is not required that a claimant return to work performing the same job responsibilities, the responsibilities must be similar in nature:

> CKS would interpret the statute so as to require a termination of TTD benefits as soon as the worker is released to perform any type of work. We cannot agree with that interpretation. It would not be reasonable to terminate the benefits of an employee when he is released to perform minimal work but not the type that is customary or that he was performing at the time of his injury.

*Id.* at 659.

While the issue in *Wise* revolves around the termination of TTD payments, the logic is equally applicable to the issue of when TTD benefits should

-10-

begin. Here, it is unrefuted that Smith was restricted in his ability to work beginning in August of 2021. From that point forward he was performing "make-work" or no work at all. And, it is unrefuted that Smith had not reached MMI to the point of being returned to employment. Clearly, the ALJ was correct in his assessment that Smith satisfied the definitional requirements of KRS 342.0011(11)(a) to begin receiving TTD benefits in August of 2021.

### b.    KRS 342.040(1)

To perform a thorough analysis of the law governing TTD benefits, one must read the definition of TTD as outlined above with the law governing the time of payments, KRS 342.040. GM argues specifically that KRS 342.040(1) precludes TTD benefit payments to Smith until March 29, 2022, maintaining Smith must have been off work for seven days before becoming eligible for TTD payments. KRS 342.040(1) reads in pertinent part, "no income benefits shall be payable for the first seven (7) days of disability unless disability continues for a period of more than two (2) weeks, in which case income benefits shall be allowed from the first day of disability."

GM relies on language in *Davis* to support this argument. "For our purposes, under KRS 342.040(1) an employer has no responsibility to pay an injured employee income benefits until they have missed at least seven days of work due to a work-related injury." 626 S.W.3d at 532. However, this language

was only an introductory clause for the remainder of the Court's discussion regarding notice; thus, GM's reliance on it is misplaced. The discussion reads in whole:

> For our purposes, under KRS 342.040(1) an employer has no responsibility to pay an injured employee income benefits until they have missed at least seven days of work due to a work-related injury. But, if an employer is obligated to pay benefits under the statute, it must inform the Department of Workers' Claims (DWC) if it either fails to make payments when due, or when it terminates benefits. The purpose of this notification is so that the DWC can then inform the employee of his right to prosecute his claim and of the applicable statute of limitations. However, Chapter 342 does not require notice to the employee of his right to prosecute or his statute of limitations if TTD benefits were neither owed nor paid.

*Id*.

The Supreme Court has, however, expounded on when TTD benefit payments are appropriate in relation to the mandate of KRS 342.040(1). In *Pierson v. Lexington Public Library*, 987 S.W.2d 316 (Ky. 1999), the claimant, Pierson, was employed by the Lexington Public Library and parked her vehicle in the free parking provided by her employer at an adjacent parking garage. The parking garage was neither owned nor maintained by the library. *Id*. at 317. On January 12, 1994, Pierson injured her left knee and elbow when the parking garage elevator dropped as she was exiting. She subsequently missed work January 13, 1994, through January 24, 1994. *Id*. The ALJ determined that Pierson was

-12-

ineligible to receive TTD benefits as she had not missed work for fourteen days. The Supreme Court disagreed explaining that the focus is on when the claimant suffers the disability and how long they remain disabled:

> KRS 342.040(1) refers only to "disability" and does not distinguish between temporary and permanent disability. Here, claimant was disabled, albeit to different degrees, from the moment of her injuries; therefore, because claimant's disability extended beyond 14 days, she was entitled to income benefits from the onset of disability.

*Id*. at 319.

GM also relies on an unpublished opinion to support its argument, *Roark v. United Parcel Service*, No. 2006-SC-000945-WC, 2007 WL 4139636 (Ky. Nov. 21, 2007). An unpublished opinion should only be relied upon if "there is no published opinion of the Supreme Court or the Court of Appeals that would adequately address the point of law argued by the party[.]" RAP[4] 41(3). As noted above, *Pierson* is on point with the questions presented to this Court. We therefore decline to consider the unpublished opinion cited by GM.

### 2. Denial of Wage Credit for Wages Paid

GM next argues it is entitled to a credit against TTD benefits pursuant to KRS 342.730(7) which states:

> Income benefits otherwise payable pursuant to this chapter for temporary total disability during the period the employee has returned to a light-duty or other

---

[4] Rule of Appellate Procedure.

-13-

alternative job position shall be offset by an amount equal to the employee's gross income minus applicable taxes during the period of light-duty work or work in an alternative job position.

It is important to note that GM concedes it only provided documentation of Smith's *gross wages* and Smith's paystubs are not in the record. GM maintains, however, that the calculations it provided of estimated taxes "in the terms most generous to [Smith]" are sufficient for the ALJ to calculate gross income minus the applicable taxes as required by KRS 342.140(7). GM mistakenly relies on *Dixie v. Ford Motor Company*, Nos. 2021-SC-0542-WC, 2021-SC-0547-WC, 2023 WL 3111827, at *6-7 (Ky. Apr. 27, 2023), to support its argument. As with *Roark*, *Dixie* is an unpublished opinion.

In *Dixie*, the Supreme Court opined regarding issue preservation and *not* wage credit calculation which is at issue here:

> Dixie next contends that Ford failed to preserve the issue of its entitlement to credits for wages he was paid and for unemployment benefits he received. He alleges that Ford raised the credit issue for the first time on appeal to the Board. The record clearly refutes this argument.
>
> First, regarding its entitlement to credits for wages paid to Dixie to offset any TTD award, Ford's brief to the ALJ states:
>
>> [Ford] is entitled to an offset for any period of TTD awarded while [Dixie] was receiving wages pursuant to KRS 342.730(7). [Dixie's] counsel has never

-14-

> provided the dates for which he is seeking
> temporary total disability benefits. Once
> [Dixie] has done so in his brief, and if TTD
> is awarded, Ford will produce after-tax
> wages.
>
> And the ALJ explicitly found in its opinion and
> order that "[Ford] is entitled to a credit for wages paid in
> accordance with KRS 342.730(7)" for the right shoulder
> and left shoulder injuries.

*Id*. at *6-7 (footnote omitted). *Dixie* is thus inapplicable to the case at bar.

Alternatively, in this case, with regards to the issue of wage credit, we agree with the analysis of the Board:

> The issue before us is whether there is evidence of record
> permitting the ALJ to determine a realistic credit, and not
> perform an exercise in speculation. Hence, the evidence
> must establish the gross wages minus applicable taxes.
> General Motors filed wage records, including Smith's
> gross wages during periods where he was working in an
> alternative position from August 2021 to March 29,
> 2022. This evidence establishes Smith earned wages
> during the same period TTD benefits were awarded; thus,
> General Motors is entitled to a credit if established by the
> evidence. General Motors bore the burden of proof
> establishing the amount of the credit it may be entitled to.
> It failed to satisfy that burden.

Both the ALJ, and the Board in affirming his decision, cite to a prior Board's opinion in *Whitaker v. Irvine Nursing & Rehabilitation*, Claim No. 2019-86691 (rendered Jun. 20, 2022), in support of the directive that employers must provide solid evidence of applicable taxes to recoup a credit for wages paid. Notably, this Court, in an unpublished opinion, *Dart Container Company, Inc. v. Bailey*, No.

-15-

2023-CA-0867-WC, 2024 WL 1685437, at *4 (Ky. App. Apr. 19, 2024), adopted

the findings in the *Whitaker* Board opinion:

> Next, we shall consider Dart's argument that KRS 342.730(7) does not require taxes to be quantified and in evidence before an offset may be permitted. Dart contends that the amount of the offset is immaterial to whether one is allowed, while Bailey argues that it was Dart's burden to prove prior to the entry of the award. In reversing the ALJ's ruling, the Board essentially adopted its holding in *Whitaker.* Because we agree with the Board's holding on this issue, we shall adopt its reasoning in the present case as our own:
>
>> Statutes and duly promulgated regulations are open to construction only if the language contained therein is ambiguous and requires interpretation. If, on the other hand, the language of the statute or regulation is clear and unambiguous on its face, statutory construction mandates that we follow the provision's plain meaning.
>>
>> In this instance, we find nothing ambiguous within the explicit language of KRS 342.730(7). KRS 342.730(7), as amended, is clear. The credit against income benefits for post-injury wages encompasses the "employee's gross income <u>minus applicable taxes</u>." (Emphasis added). As the party requesting the credit, Dart had the burden to produce evidence showing entitlement to the credit. Here, Dart filed only Bailey's post-injury gross wages and not, as mandated by KRS 342.730(7), gross income minus applicable taxes, prior to the ALJ issuing her Opinion, Award and Order.

> . . . Dart failed to timely produce the
> appropriate wage records. Consequently,
> we must reverse the granting of an offset to
> Dart against its obligation to pay TTD
> benefits for Bailey's post-injury wages
> because the evidence before the ALJ did not
> satisfy the requirements set forth in KRS
> 342.730(7).

*Id*. at *4 (citations omitted).

Unlike the unpublished opinions *Roark* and *Dixie* cited by GM, *Dart* is firmly on point and applicable to the case *sub judice*. It was GM's burden to provide proof of the employee's gross income minus applicable taxes and its failure to do so is fatal to its claim for credit.

3. **Application of a 3x Multiplier**.

Lastly, GM maintains the Board erred in affirming the ALJ's decision to apply the three-multiplier under KRS 342.730(1)(c)1., enhancing Smith's disability benefits. The three multiplier is appropriate "[i]f, due to an injury, an employee does not retain the physical capacity to return to the type of work that the employee performed at the time of injury[.]" KRS 342.730(1)(c)1. GM's argument is solely predicted on the belief that the ALJ misconstrued the facts.

> KRS 342.285 designates the ALJ as finder of fact, and
> has been construed to mean that the factfinder has the
> sole discretion to determine the quality, character,
> weight, credibility, and substance of the evidence, and to
> draw reasonable inferences from the evidence.
> Moreover, an ALJ has sole discretion to decide whom
> and what to believe, and may reject any testimony and

-17-

believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof.

*Bowerman v. Black Equipment Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009) (citations omitted).

We agree with the Board that the ALJ's interpretation of the facts was supported by substantial evidence including testimony from Smith and the medical opinion of Dr. Bloemer. The difference in Smith's pre-injury and post-injury job duties were found to be significant enough by the ALJ to apply the three-multiplier and we agree.

## CONCLUSION

In light of the foregoing, we AFFIRM the opinion of the Workers' Compensation Board.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Jeremy N. Faulk<br>Louisville, Kentucky | James D. Howes<br>Louisville, Kentucky |